GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail:  ggordon@gordonsilver.com
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
E-mail: tgray@gordonsilver.com
CANDACE C. CLARK, ESQ.
Nevada Bar No. 11539
E-mail: cclark@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
[Proposed] Attorneys for Beltway One
Development Group LLC

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

| In re:                              | Case No.:  11-21026-MKN |
|-------------------------------------|-------------------------|
| BELTWAY ONE DEVELOPMENT GROUP LLC,  | Chapter 11              |
| Debtor.                             | Date:  OST Pending      |
|                                     | Time:  OST Pending      |

**OMNIBUS DECLARATION OF TODD NIGRO IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS**

I, Todd Nigro, hereby declare as follows:

1. I am over the age of 18 and am mentally competent and I make this declaration in support of Debtor's *Emergency Motion For Entry of an Interim Order Pursuant to Bankruptcy Rule 4001(b) and LR 4001(b): (1) Preliminarily Determining Extent of Cash Collateral and Authorizing Interim Use of Cash Collateral by Debtor; and (2) Scheduling a Final Hearing to Determine Extent of Cash Collateral And Authorizing Use of Cash Collateral by Debtor* (the "Cash Collateral Motion"), the *Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for an Order Determining that Adequate Assurance Has Been Provided to the Utility Companies* (the "Utility Motion," together with the Cash Collateral Motion, the "Motions").[1]

---

[1] All capitalized, undefined terms shall have the meaning ascribed to them in the applicable Motion.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102506-003/1263110_2

2. Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents and information supplied to me by other members of Debtor's management and Debtor's business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would do so.

3. Attached hereto as **Exhibit "1"** is a summary of projected income and expenses for the three-months following the Petition Date (the "<u>Budget</u>"), which concludes on September 30, 2011.

### A. <u>Debtor's Operations</u>

4. Debtor is a Nevada limited liability company owned by: (i) Antonio Alamo; (ii) GKT 4, LLC; (iii) David and Margaret Argier; (iv) Doris Argier; (v) Thomas Barrett; (vi) Illene and Charles Casper Family Trust; (vii) Cox Family Trust dated June 7, 1993; (viii) Stan Fairhurst; (ix) Scott Georing; (x) Harris Family Trust; (xi) Christopher James Hukill Revocable Living Trust; (xii) Susan M. Jones 1989 Living Trust; (xiii) Andrew and Ruth Kryk; (xiv) Huntington Classic Limited Partnership; (xv) D.B. Neish, Inc.; (xvi) 1990 Nigro Trust; (xvii) Nevada Asset Trust dated 12/17/02; (xviii) Alan Sklar; and (xix) Easterfield #9 LLC. Debtor is managed by Beltway One Management Group, LLC.

5. Debtor owns and operates the Desert Canyon Business Park, a master planned business park located at the corner of Russell Road and the I-215 consisting of approximately 15 acres more specifically identified as APNs 163-32-111-014 and 163-32-111-012 (the "<u>Property</u>").

6. Two multi-tenant, commercial buildings are constructed on the Property, with each building being located on a separate parcel. The buildings are internally referred to as "Building 8" and "Building 11."

### 1. **Building 8, APN 163-32-111-014.**

7. Building 8 was constructed in 2006 on 2.03 acres, with 29,831 sq. ft. of net rentable area.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102506-003/1263110_2

2

8. As of the Petition Date, Building 8 was approximately 41% occupied. Its current tenants are Shadow Mesa and Craig Guenther Law Office (together, the "Building 8 Tenants," and the leases of the Building 8 Tenants, the "Building 8 Leases").

9. The collective monthly lease revenue from the Building 8 Leases is approximately $25,000.

### 2. Building 11, APN 163-32-111-012.

10. Building 11 was also constructed in 2007 on 4.2 acres, with 56,701 sq. ft. of net rentable area.

11. As of the Petition Date, Building 11 was approximately 81.1% occupied. Its current tenants are Beazer Homes, American Benefit Plan Administrators, Beecher Carlson Insurance Services LLC, DCO Energy LLC, Flamingo LLC, Lovitt & Touche, Inc., J. Lamarca & J. Polis (NV LLC), J. Lamarca & J. Polis (ASI Capital Corp.), and Capital Business Services (collectively, the "Building 11 Tenants," and the leases of the Building 11 Tenants, the "Building 11 Leases").

12. The collective monthly lease revenue from the Building 11 Leases is approximately $100,000.

### B. Debtor's Secured Loan Obligations.

#### 1. The Colonial/BBT Loan.

13. A Construction Loan Agreement was entered into between Debtor and Colonial effective as of September 20, 2006, pursuant to which Colonial agreed to lend Debtor the principal sum of $13.257 Million (the "Colonial/BBT Loan"). A true and correct copy of the Construction Loan Agreement is attached hereto as **Exhibit "2."**

14. Consistent therewith, Debtor executed the Promissory Note Secured by Deed of Trust (the "Colonial/BBT Construction Note") in the principal sum of $13.257 Million. A true and correct copy of the Colonial/BBT Construction Note is attached as **Exhibit "3."**

15. As security for the repayment of the Colonial/BBT Construction Note, Debtor and Colonial entered into the Deed of Trust and Security Agreement and Fixture Filing with

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102506-003/1263110_2

3

Assignment of Rents (the "Colonial/BBT Deed of Trust"), a true and correct copy of which is attached hereto as **Exhibit "4."**

16. As further security for the Colonial/BBT Loan, Edward Nigro, Donna Nigro, Michael Nigro, Margaret Nigro, Todd Nigro, Beltway One Management Group, LLC, and Nigro Development, LLC guaranteed repayment of the Colonial/BBT Loan (the "Colonial/BBT Collateral").

17. In May 2008, the Colonial/BBT Construction Note, which had a principal balance of $2,760,041.14, was converted to a 2-year "mini-perm" loan through the execution of the Amendment to Promissory Note Secured by Deed of Trust (the "Amended Colonial/BBT Note") and the Modification to Deed of Trust and Securities Agreement and Fixture Filing with Assignment of Rents, true and correct copies of which are attached hereto as **Exhibits "5" and "6."**

18. On the March 20, 2010 Colonial/BBT Maturity Date, the outstanding obligation on the Amended Colonial/BBT Note was approximately $3.235 Million (the "Colonial/BBT Secured Debt").

19. Both prior to and after the Colonial/BBT Maturity Date, Debtor repeatedly contacted BBT seeking to discuss the Colonial/BBT Loan, which calls and correspondence, to date, have been unanswered. Receiving no response from BBT after repeated efforts to contact BBT, Debtor ceased tendering payments post-maturity; however, BBT retains the Colonial/BBT IRA.

20. Debtor believes that the value of the Colonial/BBT Collateral (Building 8), exceeds the Colonial/BBT Secured Debt as of Petition Date.

**2.    The Wachovia/Wells Loan.**

21. A Term Loan Agreement was entered into between Debtor and Wachovia effective as of May 16, 2008, pursuant to which Wachovia agreed to lend Debtor the principal amount of $10 Million (the "Wachovia/Wells Loan"). A true and correct copy of the Term Loan Agreement is attached hereto as **Exhibit "7."**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102506-003/1263110_2

4

22. Consistent therewith, Debtor executed the Promissory Note (the "Wachovia/Wells Note") in favor of Wachovia, in the principal sum of $10 Million. A true and correct copy of the Wachovia/Wells Note is attached hereto as **Exhibit "8."**

23. As security for the repayment of the Wachovia/Wells Note, Debtor and Wachovia entered into the Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing (the "Wachovia/Wells Deed of Trust"), a true and correct copy of which is attached hereto as **Exhibit "9."**

24. Debtor also granted Wachovia an Assignment of Permits, Licenses and Approvals. A true and correct copy of the Assignment of Permits, Licenses and Approvals is attached hereto as **Exhibit "10."**

25. As further security for the Wachovia/Wells Loan, Edward Nigro, Donna Nigro, Todd Nigro, Ryanne Nigro, Michael Nigro, and Margaret Nigro (collectively, the "Wachovia/Wells Guarantors") guaranteed the repayment of the Loan, the maximum liability of which was subsequently limited to $5 Million.

26. In or about August 2008, Debtor and Wachovia entered into a swap agreement with an effective date of May 16, 2008 and a termination date of May 16, 2011. True and correct copies of the Master Agreement and Amended and Restated Swap Transaction Confirmation, attached hereto **Exhibits "11" and "12."**

27. The swap agreement was terminated pre-petition.

28. On the Wachovia/Wells Maturity Date, the outstanding obligation on the Wachovia/Wells Note was approximately $9.789 Million (the "Wachovia/Wells Secured Debt," and together with the Colonial/BBT Secured Debt, the "Secured Debt").

29. Debtor believes that the value of the Wachovia/Wells Collateral (Building 11) exceeds the Wachovia/Wells Secured Debt as of the Petition Date.[2]

---

[2] In correspondence dated May 18, 2010, Wells advised that it had obtained an appraisal of the Wachovia/Wells Collateral providing a value of $10.15 Million. Additionally, Wells obtained an appraisal dated November 17, 2010 with an "as is" value of $9.64 Million and a "stabilized value" of $10.085 Million. Debtor disputes the accuracy of these valuations as of their respective dates, as well as on the Petition Date; nonetheless, it further demonstrates that the value of Wachovia/Wells Collateral exceeds the Wachovia/Wells Secured Debt.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102506-003/1263110_2

5

**C.      The Events Necessitating The Bankruptcy Filing.**

30.     Despite having received all monthly payment obligations, on May 18, 2010, Wells issued to Debtor and the Wachovia/Wells Guarantors notices of default premised solely on an alleged loan-to-value ratio covenant default. Specifically, Wells alleged that the value of the Property was $10.15 Million and therefore, purportedly in order to comply with the covenant requiring a loan-to-value ratio of less than 70%, demanded that Debtor immediately tender a payment of $2,793,419 in order to reduce the Loan balance to $7.105 Million. Debtor was not able to satisfy the demand.

31.     Based on Debtor's ability to fully service its monthly payment obligations under the Wachovia/Wells Note, and Debtor's belief that the Property was fully secured, prior to the Wachovia/Wells Maturity Date, Debtor contacted Wells and sought to reach a consensual resolution with Wells to extend the term of the Wachovia/Wells Loan; no principal reduction or interest rate relief was requested and the Wachovia/Wells Guarantors all agreed to affirm their guarantees in the event of a maturity extension.

32.     Despite months of negotiations and Debtor's ability to service its monthly debt obligations, Wells refused to reach a consensual resolution with Debtor unless a consensual resolution was also reached with regard to separate loan obligations with Wells to which Debtor was not a party.

33.     As a global resolution could not be reached, on or about July 8, 2011, Wells recorded its Notice of Trustee's Sale and advised Debtor that it would be filing a complaint and seeking the appointment of a receiver the following week, thereby leaving Debtor with no other option but to seek Chapter 11 relief despite its ability to service its monthly debt obligations under the Promissory Note.

**D.      Debtor's Current Financial Condition.**

34.     Debtor's revenue is derived primarily from its Leases. For the period of January through May 2011, Debtor's income exceeded its expenses by in-excess-of $215,000, after payment of approximately $286,000 in principal and interest payments to Wells.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102506-003/1263110_2

6

35. Further for the fiscal year ending December 31, 2011, Debtor anticipates that its revenue will exceed its operating and capital expenses by approximately $1.15 Million.[3]

### E. The Cash Collateral Motion.

36. On the Petition Date, Debtor had cash and cash equivalents located on the Property as of the Petition Date (the "Cash on Hand") and cash in its bank account as of the Petition Date (the "Deposit Accounts") in the approximate aggregate sum of $1.29 Million. Approximately $69,028 was held in the Colonial/BBT IRA, which account is under BBT's control. Of the approximate aggregate sum of $1.29 Million, approximately $1,230,900 was not under the control of the Secured Lenders as of the Petition Date (the "Unencumbered Cash").

37. Debtor cannot meet its ongoing post-petition obligations unless it has the immediate ability to use its Unencumbered Cash and the cash generated or received by Debtor from and after the Petition Date (the "Post-Petition Cash"). In the absence of such use, immediate and irreparable harm will result to Debtor, its estate, and its creditors, and will render an effective and orderly reorganization of Debtor's business impossible.

38. An integral aspect of maintaining Debtor's business operations is Debtor's ability to use its Unencumbered Cash and its Post-Petition Cash to maintain a sufficient level of working capital in order to pay ordinary course obligations such as those to its vendors, utilities, taxing authorities, insurance, and to pay for necessary ordinary course property maintenance and projects.

39. Debtor acknowledges that the Colonial/BBT IRA is under the control of BBT and therefore constitutes BBT's Cash Collateral. However, the Unencumbered Cash, exceeding $1.2 Million, was neither in the possession of nor under the control of either of the Secured Lenders.

40. Each expense included within the Budget is a necessary expense to maintain, preserve, and/or operate the Property, which is the sole means of generating revenue, thereby increasing the value of the Property and providing the resources for Debtor to reorganize.

---

[3] This is before the principal and interest payment of approximately $286,000 tendered to date to Wells and the proposed adequate protection payments of $180,000 to Wells and $82,500 to BBT through the end of the year.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102506-003/1263110_2

7

41.  Debtor believes that the value of the Colonial/BBT Collateral exceeds the value of the Colonial/BBT Secured Debt as of the Petition Date and that the value of the Wachovia/Wells Collateral likewise exceeds the value of the Wachovia/Wells Secured Debt as of the Petition Date.  Debtor also believes that given all of the circumstances regarding the Collateral, the Collateral will not diminish in value.

**F.    The Utility Motion.**

42.  In the ordinary course of its business, Debtor incurs utility expenses for telecommunications, electricity, sewer, water, waste management, and gas.  These utility services are provided by the utilities (as such term is used in Section 366, collectively, the "Utility Providers") including, but not limited to those listed on **Exhibit "2"** to the Utility Motion (the "Utility Service List").

43.  On average, Debtor spends approximately $4,984.33 each month on utility costs.[4]  As of the Petition Date, Debtor believes it is substantially current on utility payments as set forth in the Utility Service List that came due on or before the Petition Date.

44.  Preserving utility services on an uninterrupted basis is essential to Debtor's ongoing operations and, therefore, to the success of its reorganization.  Any interruption of utility services, even for a brief period of time, would disrupt Debtor's ability to continue servicing its customers, thereby negatively affecting customer relationships, revenues, and profits.  Such a result could jeopardize Debtor's reorganizations efforts and, ultimately, Debtor's value and creditor recoveries.  It is therefore critical that utility services continue uninterrupted during this Chapter 11 Case.

45.  Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner.  Debtor expects that it will have ample liquidity, based upon cash on hand and cash flow from operations, to pay its post-petition obligations to its Utility Providers.  Specifically, Debtor's operations are currently cash flow positive prior to debt service, and

---

[4] To calculate the approximate monthly expenditure for utility costs, Debtor determined the average costs based on actual costs over twelve-month period.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102506-003/1263110_2

8

Debtor presently has approximately $1.29 Million either in cash on hand or in its bank accounts as of the Petition Date.

46.     To provide additional assurance of payment for future services to the Utility Providers, Debtor has allocated the collective sum of $4,990.00 (representing more than one month's average utility expense) to be made available from Debtor's cash flow for the first two weeks for payment of utility deposits (the "Utility Deposit Reserve").  The Utility Deposit Reserve will provide still further assurance of future payment, over and above the Debtor's ability to pay for future utility services in the ordinary course of business based upon their existing cash on hand and cash flow from operations (collectively, with the Utility Deposit Reserve, the "Proposed Adequate Assurance").  Debtor submits that the Proposed Adequate Assurance provides protection well in excess of that required to grant sufficient adequate assurance to the Utility Providers.

47.     The proposed Procedures are necessary for Debtor to carry out its reorganization efforts.  If they are not approved, Debtor could be forced to address a host of requests by its Utility Providers in a disorganized manner during the critical first weeks of its reorganization.  Moreover, Debtor could be blindsided by a Utility Provider unilaterally deciding--on or after the thirtieth day following the Petition Date--that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service.  Discontinuation of utility service, particularly electricity, could essentially shut down operations, and any significant disruption of operations could put the Debtor's reorganization efforts in jeopardy.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED this 13th day of July, 2011.

/s/ Todd Nigro
TODD NIGRO

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102506-003/1263110_2

9